Our next case of the afternoon is the People of the State of Illinois v. Nazir Smith, 4090581. For the appellant, Mr. Richards. For the appellee, Ms. Johnson. You may proceed. Thank you, Your Honor. My name is Stephen Richards, and I represent the appellant in this case, Nazir Smith. As Your Honor is aware, this is an appeal following a guilty plea for which of a conviction of armed robbery and home invasion, which Nazir Smith, 21 years old, with little or no prior criminal contacts and no criminal convictions, received 26 years, as well as a possible 30. Close to, I would calculate, around 80% of the maximum sentence. Now, the first argument that I'd like to make, and I'd ask the court to consider, is whether Judge Allad's sentence should be reversed as excessive. Now, in making this argument, I am aware of the strong deference given to a trial-of-the-court sentence in these circumstances and how rare it is for the appellate court to exercise its power to reduce a sentence. However, if there is such a case for reversal, it is here. I've looked over the cases cited both in our briefs and in the State's briefs, and in fact, the appellate court has reduced sentences even where there's been a trial, even where the defendant has taken a jury trial. In this particular case, the defendant pled guilty. Further, he not only pled guilty, he not only expressed remorse, he testified at a sentencing hearing, subjected himself to cross-examination, subjected himself to an examination by a psychiatrist, and throughout expressed extreme remorse. Not just in terms of, I'm sorry I got caught, I wish I hadn't done this, it was a bad mistake, it was a bad decision. No. He testified that he had caused the Rigdon's pain. It was a horrible offense, wasn't it? Absolutely. There is no question about it that this was a horrible offense, and I will not by any means or in any manner, shape, or form seek to justify it in one step or another. But we don't sentence the offense entirely. Obviously, the offense is a very important consideration. We sentence a person. And the question is whether given the person Nazir Smith was and is, whether this sentence is excessive. So on one hand, there is the horrible circumstances of the crime in every respect, in the fact of pre-planning, a home invasion, injuries to the victims, and so on. But as I will discuss in a moment, you have to look at the whole context. Four people were involved, you have to look at who is responsible for what, and who, without any sort of, you know, just pled guilty, took his chances, did an open plea, and presented considerable mitigation, 15 letters, numerous witnesses, and considerable support. So if we were just talking about the crime, and what was appropriate for the crime, I would agree, Justice Cook, horrible crime and punishment should be assessed. But as you know, both the Illinois Constitution and the statutes provide that rehabilitation is supposed to be taken into account as a significant factor, although not the only factor. Here we have a defendant who is 21 years old at the time. He presents a substantial life history of good conduct, good citizenship, up until his teen years when his parents divorced and he admittedly fell off the rails in many respects. And then one also has to consider, you know, I don't want to quote all of the language which goes on, defendants pass criminal record, general moral character, demeanor, mentality, social environment, family background, education, habits, age, inclination to commit crimes, and the stimuli which motivate his conduct. Now, it was quite clear, and we put in some evidence of this and tried to put in more evidence, but were prevented by some of the trial court's rulings, that in fact, of the four people who were involved, three of the people, Chad Todd, Jamal Williams, Isaiah Evans, had committed a series of these types of crimes before, which had a pattern substantially similar to the charged event. The pattern being that Chad Todd, who appears to be some sort of imagined criminal genius, at least in his own mind, would plan the crimes and take no active role in them in the sense of doing any physical force. Jamal Williams was the enforcer or the muscle, and then Isaiah Evans was kind of the junior muscle. And in fact, that was exactly the pattern which the bulk of the evidence indicates happened in the Rigdon's case, that Chad Todd was the organizer, figured out how to do it. Jamal Williams was the person who struck Mr. Rigdon when Mr. Rigdon righteously attempted to defend himself, his home, and his wife. And there was further physical activity by Mr. Evans. Mr. Evans was the one who kept it, who guarded the wife. Nazir Smith was a late addition to this crew, and it took a number of months for Chad Todd to persuade him to go along with it. And Nazir Smith said that. And he was also quite frank, which again I think is unique and different, in that he didn't say, it was my terrible childhood, I was crazy. He said, it was greed, it was the influence of Chad Todd which motivated this. So he had, as Dr. Jekyll said, considerable insight into his own behavior, to what he had done, why he had done it, and that suggests to me a potential for rehabilitation and change. So there was extremely substantial mitigation, and it is our view, and our argument, that the trial judge's sentence of an 80 percent sentence, only close to the maximum, without taking into account, although she gave nominal list service to it, this mitigation is excessive, given our Constitution and given our statute. Now, that brings us to some points which go to some of her evidentiary rulings. Taken together, I think they're significant, given the fact that this is a near maximum sentence, that anything she ruled could have had some effect. First of all, as to Dr. Jekyll. Dr. Jekyll interviewed Nasir Smith, he had the benefit of psychological testing, and he was allowed to testify to his belief that Nasir Smith showed genuine remorse. However, when we attempted to introduce the background to his belief, and one of the background of it was that Dr. Jekyll had a lot of experience interviewing forensic subjects, people who were charged with a crime and raising, you know, defenses or talking to psychiatrists for whatever reason. And we attempted to introduce evidence that his opinion was based upon comparison with those other subjects. Now, a state objection to this testimony was sustained. It's the state's position here, I believe, that the reason for the exclusion was that Dr. Jekyll was attempting to compare sentences in different criminal cases, which under People v. Bean, you as an appellate court are forbidden to do. And I acknowledge that. You're not supposed to be looking through the reports and saying, this guy got this and this guy got that. The Illinois Supreme Court said not to do that. But that's not what Dr. Jekyll was doing at all. Dr. Jekyll, as an expert, was saying, this is how I assess somebody's credibility in terms of remorse. I compare it to things I've heard or seen in other people. And he should have been permitted to so testify. Now, the trial judge, the only reason she gave for discounting the remorse and for reaching a conclusion that Nassir Smith was only sorry because he had been caught, which is basically what she said, or mostly sorry because he had been caught, was that she felt that he did not show emotion during his testimony. And that's basically all that she said. She didn't say that he was lying. She just said he didn't show emotion. In fact, I think if you look at the words of what he said, it expresses genuine remorse. Again, it's not the things one usually hears, if I may say so, from criminal defendants. I made a mistake. I was in the wrong place at the wrong time. It's somebody else's fault, et cetera. No, this was a wrong thing to do. It was wrong because it hurt the victims. It was wrong because it was their property, not my property. It was wrong because it's wrong to take things from other people. So he had insight into why what he did was wrong. I think his insight is a reflection of the fact that he did have some stability in growing up, and he did have a supportive family. And that bears upon his potential for rehabilitation. Did he attempt to explain why they would have gone in there with guns? Well, I think he did not himself explain that, except that I believe the evidence was that guns were used in the prior incidents. In other words, there was evidence which was introduced both through the cross-examination of Isaiah Evans and it was attempted more that, in fact, Chad Todd, Isaiah Evans, Jamal Williams had a kind of little operation going. When their apartments were searched, and this was introduced in the evidence, they had police scanners, handcuffs, crowbars. It was a regular criminal enterprise. Another reason for going in with guns might have been, and I'm not sure this is in the record, Mr. Rickden was a gun expert and is a gun expert. So he used guns on somebody that's next? Well, in other words, I think somebody took guns in because they thought there were guns in the house. Now, Nazir Smith's testimony was that he did not have a gun, and the others did, but obviously guns were involved. There's absolutely no question about that. And it's indisputable that was involved, and it's indisputable that not only was there harm, that there was a threat of greater potential harm. Again, I cannot excuse, minimize, or say that there's something right about what was done. Guns were used. I think one of the reasons may have been that somebody might have thought that Mr. Rickden was wrong. Actually, yes, he was. He was cleaning a gun when they entered the garage, and again, righteously attempted to defend himself, his wife, and his property. The next point at which Royce summed the evidentiary issues is, does it matter who did what during the armed robbery, and does it matter who inflicted the injury, or does it not matter? It is our position that it does matter, and it matters for a couple of reasons. One is just common sense. I mean, obviously under the rules of accountability, people are guilty of crimes even if the co-defendants do it. And the rule of the law is just because you use the division of labor and split crimes into different parts doesn't mean that you get away with anything. That's what accountability means. But when it comes to sentencing, it is certainly appropriate to determine who is the reading leader, who is the main actor, and who is the lookout or getaway driver. There is some distinction between different roles that people play and different culpability that they play. And there was dispute at the sentencing hearing as to who played what role, and I think eventually the trial judge sort of raised her hand and said, I don't know who to believe, I don't know who did what. But the bulk of the evidence, and we could have shown more evidence had she led us, was that this was a very stereotype-type operation. Chad Todd, probably not personally violent, maybe couldn't even hit somebody himself, described as shy and soft-spoken at various points, but he's the ringleader. He's the guy who plans everything out. Williams, he's the muscle. Isaiah Evans, the junior muscle. Why is Nasir Smith brought in? He's brought in, and again this is in the record, because he has the car. He's the driver, basically. Now he comes in, and he does some questioning, and eventually gets the key. But again— That questioning was in a very hostile situation where one of the victims got beat up? Not at that particular point. Mr. Rigdon was struck immediately upon the entry into the house, which the bulk of the evidence indicates was done by Williams and Evans. But he was being threatened, and they wanted to get his keys to the currency exchange, and it's clear the defendant was there at that particular time, right? Correct. There's no dispute about that, that he was there present during the threatening. There is dispute as to whether he was the person threatening. He was taking down information. That's correct, and the evidence is true as to that. And he did play that role. He did take that information, and he did help go get the proceeds. So that is also not in dispute. Was the trial court permitted to take into account the fact that there was a single charge and a plea agreement, which in effect substantially reduced the amount of time that the defendant might have been facing had the state been unwilling to enter into the agreement? I mean, is that an appropriate consideration at sentencing, that lenity is being shown by the prosecutor in part by the agreement which has been reached? No, Your Honor, I don't believe so. I think that's the point of plea negotiations. If one has, and there actually is case law in terms of what it does to a defendant. For example, if he had entered into a partially negotiated plea, right, then he couldn't challenge the excessive sentence. The law is quite clear on that. This was an open, blind plea. The prosecutor decided in their interest, for whatever reason, to avoid a trial or whatever, that they said, okay, blind plea, you can get up to 30, you have to stipulate the bodily harm, so that's 85% of whatever you get, and then we'll drop the charges. Now, I don't think it is appropriate for a trial judge to say, okay, he's gotten a break, he should get near the maximum, because after all, had he gone to trial, I could have given him a sentence similar to that of Mr. Williams. I mean, I think that's crazy in a way. It certainly would discourage plea bargaining, because then one would, you know, then what is the point of Nazir Smith not going to trial, entering into a plea, an open, blind plea, taking his chance with the judge instead of going to trial, if the judge can say, well, you know, you could have gone to trial, had you gone to trial, you could be looking at 60, 70 years, you're getting a break because you didn't go to trial. No, the break he got by not going to trial was based upon an agreement between him and the prosecutor that he was going to plead and he wasn't going to go to trial. Would it occur for the state to argue at sentencing that, Your Honor, we have taken into account many of the factors that you would be called upon to consider, and in exchange for that and in exchange for the willingness of the defendant to plead guilty, we have agreed to drop certain other charges which carry additional penalties, and the defendant here today will plead simply to one count? The answer to that question is, if I remember the question, it's yes, the argument is improper, and no, that argument would be improper, not that it was made in this case, by the way. But the answer, our answer would be yes, that argument is improper, and no, the trial judge shouldn't consider. Why is it improper? It's improper because the trial judge by statute is supposed to give a sentence within the statutory range, whatever the range is, not the statutory range that it could have been had the prosecutor done something else. I mean, it's the statutory. Every case says that as long as it's within the statutory range, that's what one looks at. First of all, if it's not within the statutory range, that's bad, obviously, because it violates the statute. But within the statutory range, it's either appropriate and proper or excessive. We're arguing it's excessive, and I think it is an interesting point Your Honor brings up, but our answer is clear. Totally inappropriate to then consider, oh, the range could have been higher had the prosecutor not exercised mercy on their own or let it be on their own. They exercised the lenity because that's what they wanted. They didn't want a trial. They wanted a plea instead. They got a plea. Well, this sort of a plea agreement, I assume you would agree, is a two-way street. I mean, the state doesn't make this decision on its own. It can only make the decision with the cooperation and corroboration of the defendant. Oh, absolutely. And I think the bargain is this is going to be the maximum, this is going to be the minimum. You can get anywhere between the maximum and minimum, 85%. It doesn't mean just because we entered into this bargain you're going to get the near maximum because, after all, we could have treated you worse. I mean, it's an agreement, but it's an agreement that sets limits, statutory limits, and it's not the same as a cap or a recommendation for a cap, whereby once the defendant enters into that, he gives up his right to contest the excessiveness of his sentence. What Your Honor was saying was correct, and my time has expired, so let me just finish my sentence. If what Your Honor is saying was correct, then the whole doctrine that one may challenge an open plea as excessive would be out the window because it could always be said, well, after all, it's an open plea, but it could have been more, and the charge has not been dropped. Well, except that, realistically, a lot of sentencing hearings don't show the specific factual evidence that could lead or might have led to trial on the other charges. I mean, the basic facts that are agreed to, other than levels of participation and perhaps who was who, show a complicity of all four individuals for a series of offenses for which there would be accountability. And I've seen a lot of sentencing hearings that don't have that much detail. Well, Your Honor, the detail was provided both by the State and by the defense. By yourself, yes. Because it was an open plea, it was a contested hearing, we believe we were entitled to argue for the minimum, the State believed they were entitled to argue for the maximum, and our argument is something so close to the maximum and so far from the minimum is, under these facts given Nazir Smith, excessive, notwithstanding that theoretically the State could have tried him on more charges and gotten more time had there been a trial and a jury and all sorts of other things. Thank you. We'll hear from you on rebuttal. Thank you. May it please the Court. As has already been set out in my brief and mentioned today, it was an egregious offense and the details are, and the facts in the record are significant, outlining just how horrible the offense was. Most of defendants' arguments today strike me as being a question of wanting to argue whether there was, whether this defendant should be responsible for the great bodily harm that was inflicted on both of the victims. The reality is his relative role in causing that injury was somewhat removed from being relevant at sentencing by a stipulation that he willingly made that he or those who he was responsible for caused great bodily harm to both of those victims. If defendant, as was said, defendant did take a bargain, and in that bargain obviously he was hoping that the trial court would find closer to the minimum. But the reality is he got within the sentencing range. This is not excessive. He had this stipulation that he is now trying to come back and challenge. He didn't move to withdraw his guilty plea, which he could have. And he could have gone to trial to attack and further put out his points of evidence on what role he did play or he didn't play. I'm sure, again, this was a weighing of costs and benefits. But this was the bargain he made. To now come back and have multiple issues that all come back to simply attack his role is not relevant as the trial court found at a sentencing hearing. In terms of Dr. Jekyll's testimony and the evidence that defendant had good behavior in his early teens, the state's not contesting that. But the good behavior of a preteen does not in any way mitigate the behavior of a teen once they reach the age of accountability. And even Dr. Jekyll testified that divorce and family difficulties would have played one role in defendant's criminal activities. But it in no way was the main or overshadowing cause of the defendant's activities. It was greed. And defendant himself got up there and did rightfully take responsibility of that. He was looking for an easy way to get some material object that he wanted without working for them. The doctor was allowed to testify that the defendant, he believed the defendant to be genuine in his remorse. But he was rightfully not allowed to testify that he was more remorseful or more candid than other defendants in unrelated cases to this. The doctor's opinion that he was remorseful has inherent in it. The basis for that opinion is his experience with other people he has interviewed, defendants and patients. So in reality, that is already built into the opinion that based on his experience with other patients, other defendants, he can make that professional expert opinion that this defendant was candid and was remorseful. The trial court, however, is allowed, based on its own observations, to say that they felt the remorse maybe was more at being caught than it was at the actions that were actually taken. Again, that's a perfectly proper observation for a trial court to make based on its own viewing of how the trial goes, or not the trial, but how the defendant testifies. There was, as I recall also, no specific testimony as to why guns were brought into this. So anything beyond that is speculation. I do not recall at any point during this that there was an explanation as to that. The trial court, in terms of the lenity that was built into or a question of whether it was built into the plea, the trial court was clear in saying I'm sentencing the defendant for the offense for which he pled guilty. But the trial court also had its eyes wide open and said this isn't going to happen in a vacuum. And the factual basis for the plea agreement also included evidence of these other charges that were dropped. For the trial court to make a proper sentence, it was allowed and it did consider the totality of the facts. That does not mean, however, that it was an improper sentence that resulted in an excessive sentence here. Again, I'm happy to answer any questions, but for the most part I'm just going to rely on the arguments that were made in the brief. Do you have any questions? If we do not, thank you. Your Honor, first just as a correction, Mr. Smith was 19 at the time of the offense. He was 21 when he was actually sentenced. Just in response to the argument that somehow by stipulating to great bodily harm as part of the plea, we have given up our right to contest who personally caused the harm. I think two things have nothing to do with each other. Is there any merit to your opponent's statements that your brief fails to cite properly to the record? Well, Your Honor, I acknowledge that I got the volume numbers wrong, but I got the page numbers right and she was able to find what the references were to. I apologize for that, Your Honor. Does that help us? I agree with that. Your Honor, I would just again like to say that there was a substantial question as to who caused the injury. The fact that we stipulated that there was great bodily harm as part of the plea, I mean, if there's great bodily harm, even if you're accountable for it, you get 85%. So that's not the issue. I mean, his participation had something to do with the bodily harm, clearly, and he stipulated to that, and that's why he got 85%. But he was entitled to contest, as he did during the sentencing hearing, what he actually did. And we'd ask you to consider that in regard to whether the sentence of 26 out of 30 years under these circumstances is excessive. Thank you. Thank you, Counsel. We'll take the matter under advisory.